Thomas H. Lineaweaver v. Commissioner.
Lineaweaver v. Commissioner
Docket No. 351.
United States Tax Court
1944 Tax Ct. Memo LEXIS 294; 3 T.C.M. (CCH) 331; T.C.M. (RIA) 44115; April 8, 1944
*294 John F. Greaney, Esq., for the petitioner. Myron S. Winer, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent has determined a deficiency in income tax against the petitioner for the year 1940 in the amount of $2,414.22. The only question for determination is whether the petitioner is entitled to a deduction from gross income of $12,300 as a long-term loss, that amount being 50 percent of the cost to him of stock in Grays Ferry Brick Company, which stock had been surrendered in 1935, petitioner receiving therefor the right to subscribe to 155 shares of stock at $100 per share within three years and a warrant giving him the option to purchase 38 additional shares within 90 days after May 1, 1940, the purchase price of such additional shares to be based upon the net earnings of the company for the fiscal years 1937, 1938 and 1939. The petitioner did not exercise the option under the warrant, and contends that by reason thereof he suffered a loss in 1940 of his original investment in the stock of the brick company, this contention being based upon the assumption that the transaction whereby the stock of the company was surrendered *295 in 1935 and warrants were received was a reorganization within the meaning of the income tax statute and the petitioner's basis for the stock was carried over to the warrant received by him. It is the claim of the respondent, first, that the 1935 transaction was not a reorganization within the meaning of the statute, and, second, that in any event, the warrants became worthless before 1940. Findings of Fact Most of the facts were stipulated and are found as stipulated. Petitioner is a resident of Haverford, Pennsylvania, and filed his income tax return for 1940 with the Collector of Internal Revenue in Philadelphia. He is president and general manager of Grays Ferry Brick Company, a Pennsylvania corporation organized by him in 1929, for the purpose of manufacturing and selling sand-lime brick. On October 31, 1929, February 13, 1930, and April 18, 1930, the petitioner acquired 200, 5 and 41 shares, respectively, of brick company common stock. He paid $100 per share for the said stock, or a total of $24,600. At all times since its organization the total authorized capital stock of the brick company has been 1,000 shares of common stock. The building industry was deeply affected *296 by the depression in the early 1930's and the brick company was unable to obtain sufficient volume of business to make a profit. About 1931 a search was begun for other products in addition to brick which might be produced in the plant. About 1932 the company began to experiment in the manufacture of a concrete block, using the high-pressure steam curing cylinder used in the sand-lime industry, and it was discovered that the action of high-pressure steam on concrete produced an improved concrete block. When so processed, the concrete would harden completely in 12 hours, which meant that the blocks would not spring in a wall so as to cause the wall to crack. By 1934 a considerable dollar volume of business in the production of concrete blocks had resulted. The brick company sustained operating losses for the years 1931, 1932, 1933 and 1934, of $10,443.53, $11,464.29, $9,016.52 and $1,714.11, respectively. It was in need of additional working capital throughout the period from 1930 to 1935. Some attempts had been made to raise funds by issuing additional stock to stockholders, and in 1931 one loan previously made to the company was converted into common stock. In 1933 some of the stockholders *297 contributed $10,075, which was entered as surplus on the books of the company. Also in 1933, two of the stockholders permitted the cancellation of a company note for $5,000, and that amount was entered as a credit to the surplus account. By May 6, 1935, it was apparent that the brick company must have additional working capital if it was to continue operations. It was not feasible to obtain outside funds except on ruinous terms, so that the only practical way of raising the money was from the stockholders themselves. A number of the stockholders, of whom the petitioner was one, were either unable or unwilling to invest any further money in the company. All of the stockholders agreed to turn in their stock under a refinancing plan. The stock outstanding on that date was held as follows: Mabel Hastings Robb
270 Shares
Edward Browning, Jr.
51 Shares
Edwin E. Graham
15 Shares
T. Mitchell Hastings
20 Shares
Mt. Gretna Brownstone Company
75 Shares
Henry B. Robb, Jr.
150 Shares
Clement A. Griscom, 3rd
150 Shares
Thomas H. Lineaweaver
246 Shares
977 Shares
At special meetings held on May 6, 1935, the directors, and then the stockholders, adopted a plan designed to revamp *298 the capital structure of the company. The plan is set forth in the resolution of the board of directors as follows: "RESOLVED, that whereas each holder of shares of the capital stock of this corporation (there being now outstanding 977 shares of the 1,000 authorized shares of the $100. par value capital stock) has agreed to make over, sell, assign and convey to the Treasurer of this corporation all of his or her right, title and interest in and to said shares of capital stock and to deliver all of the certificates therefore, properly endorsed in blank, to the Treasurer for the purposes and for the consideration hereinafter set forth. "IT IS FURTHER RESOLVED, that upon receipt of certificates for said 977 shares properly endorsed, together with instruments conveying all right, title and interest in and to said shares of stock, the Treasurer shall reissue 310 shares thereof at their par value of $100. each, to the following persons in consideration for sums already loaned by them to the corporation and sums to be paid by them for said stock as follows: Amount of
money previ-
Amount of
No. of
ously loaned
money presently
Shares
to corporation
to be invested
Mabel Hastings Robb
195
$9,750.
$9,750.
Edward Browning, Jr.
100
5,000.
5,000.
Matthew H. McCloskey, Jr.
10
none
1,000.
Edwin E. Graham
5
none
500.
*299 That an additional 155 shares shall be held by the Treasurer of the corporation subject to an option to Thomas H. Lineaweaver to purchase all or any part of said shares of stock at any time within three years from May 1, 1935 at $100 per share. "That an additional number of said shares of Capital Stock to be at all times equal to one-third of the shares actually issued and outstanding, shall be held by the Treasurer of the Corporation subject to an option to the present stockholders to purchase a number of shares of Capital Stock equivalent to one-third of said shares actually issued and outstanding on May 1, 1940, each stockholder then to be entitled to purchase an amount of said shares proportionate to his or her present stockholdings in the Corporation as now set forth in the stock transfer book. The right to exercise said option shall accrue on May 1, 1940 and is to be exercised by the person then having the right thereto notifying either the Secretary or Treasurer of the Corporation in writing not more than sixty days from May 1, 1940 of his or her intention of exercising the said option, and the purchase must be completed within ninety days after May 1, 1940 or else the option *300 will expire. The price per share of said shares of stock shall be determined as follows: Eight times the average yearly net earnings of the corporation for the fiscal years 1937, 1938 and 1939, as determined by sound accounting methods, divided by the average number of shares actually issued or reissued and outstanding during said three year period. Each shareholder now of record shall immediately be issued a negotiable warrant for said option. "That the remaining shares of stock to be turned in by the shareholders, as well as the 23 shares of stock now unissued, shall be held in the Treasury subject to issuance or reissuance at any time upon order of the directors and stockholders of the corporation." Pursuant to the above plan the holders of the outstanding stock of the company endorsed their respective stock certificates and delivered them to the company. Mabel Hastings Robb had previously loaned the company $10,300, instead of $9,750, as shown in the above resolution. She paid $9,200 additional into the company, bringing her total payments to $19,500, and received therefor 195 shares of brick company common stock, 192 shares being issued in her name and 1 share each in the names *301 of the petitioner, Clement A. Griscom, 3rd, and Henry B. Robb, Jr. Edward Browning, Jr., paid in the additional $5,000 required of him under the plan, and for the $5,000 so paid and the $5,000 previously loaned to the company, received 100 shares of stock. The amounts previously loaned by these individuals and the cash currently paid in were credited to the capital stock account on the company's ledger. Matthew H. McCloskey, Jr., paid the $1,000 required of him under the plan and received 10 shares of brick company stock. Similarly, Edwin E. Graham paid $500 and received 5 shares of stock. Except for the names, dates and amounts, the certificates of stock issued under the plan were identical with the certificates which had been surrendered. The remaining 667 shares of the brick company's common stock have always since remained in the treasury of the company and have never been issued or reissued. Stock warrants as called for in the plan were issued on June 1, 1935, as follows: Number
of Shares
Stated
Name
in Warrant
Mabel Hastings Robb
42
Edward Browning, Jr.
8
Edwin E. Graham
3
T. Mitchell Hastings
4
Mt. Gretna Brownstone Company
12
Henry B. Robb, Jr.
24
Clement A. Griscom, 3rd
24
Thomas H. Lineaweaver
38
Total
155
*302 On adoption of the resolution set forth above, the petitioner agreed to continue to manage the brick company for a period of three more years, at a monthly salary of $400 plus 25 percent of the net annual profits as compensation for his services. At April 30, 1935, prior to adoption of the stock surrender plan, the brick company's balance sheet disclosed a capital stock liability of $97,700 and a deficit of $17,753.11. On June 30, after the above plan had been carried out, its balance sheet disclosed a capital stock liability of $31,000 and a surplus of $46,322.90. Except for 1938, when there was a recession in the building industry, the sales volume of the brick company increased during the period from 1935 to 1940. The cost of producing concrete blocks by the high-pressure steam process was greater than when produced by the ordinary open-air method and efforts were made by the brick company to reduce its production costs, resulting in the installation of some labor-saving devices. The company also endeavored to extend the sales of its concrete blocks, and by 1939 had obtained approval thereof by architects and engineers in the Philadelphia area. In the fall of 1939, the Baltimore *303 Housing Authority included in its specifications for the construction of a certain apartment development a requirement that steam-cured concrete blocks be used. An order for concrete blocks was received by the brick company from the Baltimore housing agency in 1940, and delivery thereunder began in the summer of that year. The Federal income and excess profits tax returns of the brick company for the years 1935 to 1940 disclose net losses as follows: 1935
$10,121.98
1936
10,124.10
1937
28,149.12
1938
31,677.29
1939
45,443.82
1940
30,114.91
At the close of each of the same years, 1935 to 1940, inclusive, the net worth of the brick company as shown by the balance sheets attached to its returns was as follows: 1935
$73,218.71
1936
62,994.61
1937
34,845.49
1938
2,800.47
1939
(45,153.04)
1940
(75,260.15)
For the first six months of 1940, the brick company sustained a net loss of $10,122.22. For the month of July 1940, it had a profit of $4,707.32. From April 1, 1943, to the date of the hearing herein in November 1943, it had a net profit each month. During the period 1935 through 1940, advances or loans were made to the brick company by its stockholders *304 and by the petitioner, as follows: September 19, 1936
Mabel Hastings Robb
$ 2,500.00
September 30, 1936
Thomas H. Lineaweaver
6,800.00
December 14, 1936
Edwin E. Graham
500.00
September 30, 1937
Henry B. Robb, Jr.
11,000.00
November 15, 1940
Thomas H. Lineaweaver
7,500.00
December 4, 1940
Thomas H. Lineaweaver
4,000.00
Total
$32,300.00
The petitioner was unwilling to have the above $6,800 applied to the purchase of stock in the brick company because he preferred the risk of a creditor rather than that of a stockholder. During the period between January 1, 1937 and April 15, 1940, the brick company borrowed through petitioner, as agent, a total of $180,392.69. Of the $32,300 received by way of advances from its stockholders and from the petitioner, as shown above, the brick company has repaid nothing; neither has it paid any interest thereon. Similarly no interest has been paid on the $180,392.69 borrowed by it through petitioner as its agent, and only $1,700 on principal has been repaid. By July 1942, the brick company had obtained additional loans of $93,000 from the same individuals who had loaned the $180,392.69 above, and at the time of the hearing no *305 part of these loans had been repaid and no interest had been paid thereon. The petitioner did not purchase any of the 155 shares of brick company stock which under the corporate resolution of May 6, 1935, he was entitled to purchase at $100 per share, at any time within three years after May 1, 1935; neither did he exercise his right under the warrant issued to him pursuant to the same resolution which warrant permitted the purchase of 38 shares of brick company stock, on specified notice, during the 90 days following May 1, 1940. Similarly none of the warrant-holders purchased or acquired any of the shares of the brick company stock which they were privileged to purchase under the warrants held by them. Neither the petitioner nor any other warrant-holder at any time notified the company in writing of any intention to purchase shares of its stock under the said warrants. There was no disposition of the stock warrants by any of the holders thereof during the interval from the time of their issue until the date of expiration of the rights thereunder. The stock warrants were worthless prior to 1940. Opinion It is the contention of the petitioner that the transaction in 1935, wherein *306 and whereby he surrendered his stock in the brick company and received the stock warrant, was a reorganization within the meaning of section 112(g)(1)(D) of the Revenue Act of 1934; that the warrant was a security within the meaning of section 112(b)(3) of the act and the basis therefor, under section 113(a)(6), was the same as his basis for the stock surrendered; and finally, that upon the expiration in 1940 of his right to purchase stock under the said warrant, he sustained a deductible loss. It is the contention of the respondent, first, that the 1935 transaction was not a reorganization within the meaning of section 112(g), supra, and second, that even if the transaction was a reorganization and the basis of the brick company stock surrendered by the petitioner in that transaction became the basis of the warrant received, the warrant became worthless prior to 1940 and no loss in respect thereto was sustained in 1940, so as to entitle the petitioner to the deduction claimed. If the respondent is correct in his contention that the warrants of the brick company, issued to stockholders in 1935 upon the surrender of brick company common stock, became worthless prior to 1940, *307 the petitioner's loss of the amount previously invested in the brick company's common stock was sustained prior to the taxable year, and it matters not whether the 1935 transaction was a reorganization within the meaning of section 112(g), supra, or the warrants were securities within the meaning of section 112(b)(3), supra. We have considered all of the evidence in the case, the facts stipulated and those found from the evidence, and have concluded and found as a fact that the stock warrants were worthless prior to 1940, the taxable year herein. The petitioner accordingly sustained no deductible loss in respect thereto in 1940. Decision will be entered for the respondent.